# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

RAVI PATEL,                              :        CIVIL ACTION NO.: 02-6141 (SMO)

    *Plaintiff,*                          :

    v.                                   :

CIGNA CORPORATION and
TAC PROFESSIONAL STAFFING
SERVICES, INC.  d/b/a,
EDP CONTRACT
SERVICES                                 :

    *Defendants.*                        :

**ORIGINAL FILED**

**JAN – 8 2003**

WILLIAM T. WALSH
CLERK

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT AND JURY DEMAND

### I.    INTRODUCTION:

1.    Plaintiff, Ravi Patel, claims of Defendants, Tac Professional Staffing Services, Inc. d/b/a, EDP Contract Services and CIGNA Corporation, a sum in excess of $100,000 in damages upon a cause of action whereof the following is a statement:

2.    This action for declaratory, injunctive, monetary and other appropriate relief is brought by Plaintiff to redress violations by Defendant of rights secured to Plaintiff by the laws of the United States of America.

3.    This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e), et seq., as amended by the Civil Rights Act of 1991, at 42 U.S.C. §1981(a) ("Title VII") and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5.1, et seq., and is brought by Plaintiff to redress arbitrary, improper, unlawful, willful, deliberate and intentional

discrimination and retaliation with respect to his compensation, terms, conditions and privileges of employment by the Defendant, based on his national origin (Indian) and opposition to discrimination.

## II   JURISDICTION AND VENUE:

4.    The jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. §1331 and Title 42 U.S.C. §2000e-5(f), which provide for original jurisdiction of Plaintiff's claim arising under the laws of the United States and over actions to recover damages and to secure equitable and other relief under the appropriate governing statutes.

5.    The venue of this Court is invoked pursuant to the dictates of Title 28 U.S.C. §1391(c).

6.    The supplemental jurisdiction of this Court is invoked pursuant Title 28 U.S.C. §1367 to consider Plaintiff's claims arising under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5.1, et. seq.

7.    All conditions precedent to the institution of this suit have been fulfilled. On October 24, 2002 a Notice of Right to Sue was issued by the Equal Employment Opportunity Commission. This action has been commenced within ninety (90) days of receipt of said Notice.

8.    Prior thereto, on June 28, 2002, the U.S. Equal Employment Opportunity Commission found that probable cause existed to establish a violation of Title VII against both Defendants.

## III.   PARTIES:

9.    Plaintiff, Ravi Patel, is an individual and citizen of the Commonwealth of Pennsylvania and resides therein at 1901 West Chester Pike, #F-9, Havertown, Pennsylvania..

10.     Defendant, Tac Professional Staffing Services, Inc. d/b/a, EDP Contract Services, ("EDP") was and is now a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania with a business address of 401 City Avenue, Suite 915, Bala Cynwyd, Pennsylvania.

11.     Defendant, CIGNA Corporation ("CIGNA") was and is now a corporation duly organized and existing under the laws of the State of Delaware with a business address of 401 White Horse Pike, Voorhees, New Jersey.

12.     At all times relevant hereto, the Defendants were acting through their agents, servants and employees, who were authorized and acting within the scope of their authority, course of employment and under the direct control of the Defendants.

13.     At all times material herein, the Defendants have been a "person" and "employer" as defined under the Title VII and the NJLAD and have been, and are, subject to the provisions of each said Act.

## IV.   CAUSES OF ACTION:

14.     On or about November 23, 1998, the Plaintiff was hired by EDP and placed to work as System Administrator at CIGNA's office facility located in Voorhees, New Jersey.

15.     During his tenure of employment with CIGNA, the Plaintiff maintained a satisfactory job performance rating and at all times performed his job function in a dutiful and competent manner.

16.     On or about September 10, 2001, one day prior to the terrorist attack on the World Trade Center and the Pentagon, EDP's Contract Manager, one Jeffrey Gowman, informed the Plaintiff that his contract was going to be extended from November of 2001 until November of

2002.

17.    On or about September 14, 2001, the Plaintiff received written confirmation of the said contract extending his services through November of 2002.

18.    After the terrorist attacks of September 11, 2001, the Plaintiff was subjected to a systematic and continuous pattern of harassment and discrimination on the basis of his national origin (Indian) by his co-workers at CIGNA.

19.    In connection thereto, the Plaintiff's co-workers subjected him to comments pertaining to whether he had taken pilot lessons to fly crop dusters and telling him that he looked like a pipe bomber if he covered his mouth. In addition to the said comments, Plaintiff's co-worker made hand signs blocking the lower end of his face, commenting how he looked like "them," meaning terrorists. Also, the Plaintiff's co-workers commented on how the Plaintiff shaved his goatee and questioned him as to whether he was "trying to hide something." These and other similar derogatory remarks related to the Plaintiff's national origin were made on a continuous and unrelenting basis.

20.    The aforesaid conduct created a hostile and offensive working environment for the Plaintiff and made it unbearable for him to continue to perform his job function in a professional and competent manner.

21.    On or about September 20, 2001, the Plaintiff complained to Gowman regarding the aforesaid harassing and discriminatory treatment by Plaintiff's co-workers.

22.    Gowman failed to undertake any investigation into the Plaintiff's concerns regarding the said harassment and discrimination or to cause the harassment to cease and desist.

23.     Again, on or about September 24, 2001, the Plaintiff complained to Bruce Kline, a CIGNA Manager in their Security Administration, regarding the aforesaid harassing and discriminatory treatment initiated against him by his co-workers.  However, the said complaint likewise went unaddressed by CIGNA's management and the harassment of the Plaintiff continued.

24.     Subsequent to registering the aforesaid complaints of discrimiantion, on or about September 29, 2001, Defendants engaged in an act of retaliation by terminating him from his position of employment without any legitimate business reason.

25.     The Plaintiff believes and avers that any purported reason for his dismissal was pretextual and motivated instead by reasons of his national origin and complaints of discrimination, as aforesaid, in that prior to the September 11th attacks, the Defendants gave the Plaintiff every indication that his position of employment was secure and would be extended accordingly.

26.     As a direct result of the aforesaid discriminatory and retaliatory treatment, the Plaintiff filed a Charge of Discrimination against EDP and CIGNA with the U.S. Equal Employment Opportunity Commission ("EEOC").

27.     After investigating the Charges filed by the Plaintiff, the EEOC concluded in a finding of probable cause, that the evidence obtained during the investigation established that the Defendants retaliated against the Plaintiff for opposing unlawful discrimination against him due to his national origin in violation of Title VII.

28.    In its finding of Probable cause in favor of the Plaintiff, the EEOC concluded:

Evidence of record indicated that CIGNA had a sincere interest in extending [Plaintiff's] contract on September 13, 2001. The Commission finds it suspect that approximately one week after September 11, when the media began focusing on terrorist organizations in the Middle East and at a time when some of [Plaintiff's] co-workers were allegedly making negative comments linking [Plaintiff] with such activities, that [Plaintiff's] work status became a point of contention. The evidence indicates that [Plaintiff] had a lunch meeting with Respondent's Account Manager on September 20, 2001. It was at that meeting that [Plaintiff] allegedly described instances of discrimination. It was also at this meeting that Respondent's Account Manager allegedly received a demand for $30.00/hour. ([Plaintiff] challenges the fact that there was ever a set monetary figure stated.) Evidence of record indicates that [Plaintiff's] replacement was contacted by Respondent's Account Manager on September 21, 2001 and an interview with the replacement was set up and carried out on September 25, 2001. These actions occurred while [Plaintiff] was still employed with Respondent and still under the impression that his services would be retained.

Witness testimony also indicates that [Plainitff] reported the harassment to Cigna's Department Manager and such information was related to Cigna's Sr. Customer Support Specialist. Evidence of record supports [Plaintiff's] contentions that he was never told he was fired when he left work on Friday, September 28, 2001. Instead [Plaintiff] was informed of his termination by Respondent's Account Manager on Saturday, September 29, 2001, which gave him no time to retrieve notes written on post-its which allegedly contained references of harassment.

Evidence of record revealed that Respondent's Contract Manager spoke with Cigna's Department's Manager after the lunch meeting in which [Plaintiff] made the complaints of national origin related harassment. The Commission finds it suspect that no negotiations of the requested increase per hour were thereafter attempted and a replacement search commenced immediately. Compounding the suspicion is witness testimony that contradicts Respondent Account Manager's testimony that he knew nothing of the harassment complaints.

Therefore, the Commission finds that there is reasonable cause to believe that [Plaintiff] has been retaliated against in violation of Title VII.

-6-

29.     The Plaintiff believes and therefore avers that there was no legitimate business reason for his dismissal and that his termination was discriminatory based on his national origin (Indian) and in retaliation for opposing illegal discrimination.

<u>COUNT I</u>
(Title VII – National Origin Discrimination/Hostile Work Environment/Retaliation)
<u>Plaintiff v. Defendants</u>

30.     Plaintiff incorporates by reference paragraphs 1 through 29 of this Complaint as fully set forth at length herein.

31.     The actions of Defendants through their agents, servants and employees in subjecting the Plaintiff to discrimination based on his national origin in the terms, conditions and privileges of his employment, to a hostile work environment, and to retaliation in the form of discharge for opposing discrimination, as aforesaid, constituted a violation of Title VII.

32.     The unlawful discriminatory employment practices engaged in by the Defendants were in violation of the provisions of Title VII of the Civil Rights Acts of 1964, 42 U.S.C. §2000(e), <u>et seq.</u>, as amended by the Civil Rights Act of 1991 at 42 U.S.C. §1981(a).

33.     As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendants in violation of Title VII, the Plaintiff has sustained loss of earnings, loss of future earning power, plus back pay, front pay, and interest due thereon, in addition to severe emotional and psychological distress, and loss of self-esteem.

-7-

**COUNT II**
**(NJLAD - National Origin Discrimination/Retaliation)**
**Plaintiff v. Defendants**

34.   Plaintiff hereby incorporates by reference paragraphs 1 through 33 inclusive contained in the foregoing Complaint as though fully set forth herein.

35.   Based on the foregoing, Defendants have engaged in unlawful practices in violation of the NJLAD. The said unlawful practices for which Defendants are liable to Plaintiff include, but are not limited to subjecting the Plaintiff to discrimination based on his national origin in the terms, conditions and privileges of his employment, to a hostile work environment, and to retaliation in the form of discharge for opposing discrimination, as aforesaid, constituted a violation of the NJLAD, N.J.S.A. 10:5.1, et. seq.

36.   As a direct result of the unlawful discriminatory employment practices engaged in by the Defendants, in violation of the NJLAD, N.J.S.A. 10:5.1, et seq., the Plaintiff has sustained loss of earnings, loss of future earning power, plus back pay, front pay, and interest due thereon, in addition to severe emotional and psychological distress, and loss of self-esteem.

**PRAYER FOR RELIEF**

37.   Plaintiff repeats the allegations of paragraphs 1 through 36 of this Complaint as if set forth herein at length.

WHEREFORE, Plaintiff requests this Court to enter judgment in his favor and against Defendants and order that:

a.   Defendants reinstate Plaintiff to his former position of employment, with a rate of pay and other benefits and emoluments of employment, to which he would have been entitled,

had he not been subjected to unlawful discrimination;

     b.      Defendants compensate Plaintiff with an award of front pay, if appropriate;

     c.      Defendants compensate Plaintiff for the wages and other benefits and emoluments

of employment lost, because of their unlawful conduct;

     d.      Defendants  pay to Plaintiff compensatory damages for future pecuniary losses,

pain, suffering, inconvenience, mental anguish, loss of employment of life and other

nonpecuniary losses as allowable;

     e.      Defendants pay to Plaintiff punitive damages, pre and post judgment interest,

costs of suit and attorney and expert witness fees as allowed by law;

     f.      The Court award such other relief as is deemed just and proper.

### JURY DEMAND

Plaintiff demands trial by jury.

                     Respectfully submitted,

                     LOVITZ & GOLD, P.C.

                     BY: _____

                     TRACI M. GREENBERG, ESQUIRE
                     Eleven Penn Center - Suite 515
                     1835 Market Street
                     Philadelphia, PA 19103
                     (215) 569-1999

# EXHIBIT B

Agreement No. 00-126-100

# MASTER INFORMATION PROCESSING
# TIME AND MATERIALS
# CONSULTING SERVICES AGREEMENT

**Consultant:**
EDP/Temps and Contract Services
433 South Main Street
West Hartford, CT 06110

**COMPANY:**
Connecticut General Life Insurance
Company
1601 Chestnut Street
Philadelphia, PA 19192-2296

Agreement dated April 1, 2000 between the above named Company and the above named Consultant, who agree as follows:

## 1. SERVICES

During the period of this Agreement, Consultant will provide Company with consulting, analysis, programming, software development, enhancements, technical writing, and/or design services with respect to the use of electronic information processing machines or management services as more specifically described in the written "Task Order(s)" referred to in Paragraph 4 herein.

## 2. FEE

In consideration for the services to be provided during the period of this Agreement, Company will pay Consultant the fees outlined in each Task Order. The maximum fees for each of the categories are outlined in Exhibit "E".

Actual rates shown on Task Order(s) shall be based on each professional's current skill level. Consultant's rates shall include local commuting expenses.

## 3. TERM

This Agreement shall have an original term of Two (2) year(s) commencing on its date of acceptance by the parties, subject to the cancellation provisions provided herein. This Agreement may be extended by written agreement between Consultant and Company. Task Orders incorporating this Agreement by reference may extend beyond the termination of this Agreement.

## 4. TASK ORDER(S)

Company shall submit any task upon which it desires the services of Consultant in the form of a written Task Order substantially as set forth in Exhibit "A"; said Order being in sufficient detail to define the Task and the type of service to be provided by the Consultant. Company's Task Order(s) shall specify:

   a.   the nature, extent of work, and goals of each Task to be performed by Consultant thereunder, when each shall be performed, and the order of performance;

   b.   the required products to be delivered by Consultant upon completion of each Task, and the form each product shall take.

1

Company's Task Order(s) shall become effective on the date of acceptance by the parties, shall terminate as set forth therein, and shall incorporate this Agreement by reference.

Company shall not be liable for any Tasks, services, or expenses provided by Consultant not covered by an executed Task Order.

## 5. CONSULTANT'S EMPLOYEES

To ensure continuity of the service effort covered by this Agreement, Consultant shall assign employees of Consultant on a full-time basis for performance of the services described in Company's written Task Order(s). The names of the individuals assigned by Consultant and their specific capacities in the work to be performed will be described in the Task Order. Consultant shall provide Company with resumes of the individuals to be assigned. Company reserves the right to request Consultant replace, for reasonable cause, any Consultant employee working under a Task Order.

To ensure the security of CIGNA data and confidential information, all Consulting Firms representatives, account managers or account executives are required to make appointments with the CIGNA Program Manager or management official before discussion of an upcoming requirement. At no time shall any consulting representative be allowed in any CIGNA building unescorted. At no time shall any consultant or consultant represenative enter an office, cube or workspace of any CIGNA employee when he/she is not present. Any violation to this mandate may be grounds for immediate dismissal of the Consultant represenative and/or removal of the Consulting Firm from the Preferred Vendor Program.

## 6. SUPERVISION

Consultant's personnel shall work under Consultant's supervision. The name of the individual assigned by Company to approve the work to be performed will be identified in the Task Order, but is subject to change at Company's discretion. Company shall neither have nor exercise control or direction over the means and methods by which Consultant shall perform services under this Agreement.

## 7. CANCELLATION

Company shall have the right to cancel this Agreement or a Task Order hereunder, without advance notice and even if such cancellation occurs after Consultant has begun work, any and all request(s) for services under any Task Order by notifying Consultant in writing of such cancellation. Upon receipt of such notification, Consultant will immediately cease work upon the canceled Task(s). Consultant shall be entitled to payment, under the provisions of Paragraphs 2, 8, and 9 of this Agreement, with respect to fees and expenses earned and/or incurred up to the time of said cancellation.

## 8. MAXIMUM AMOUNT

Company shall have the right to specify the maximum amount to be paid under a Task Order. In such case Consultant shall not perform services exceeding the amount specified for the Task without a written amendment t the Task Order. If it becomes apparent during the performance of said Task that the cost for completion wi exceed the maximum amount specified, Consultant shall advise Company as far in advance as possible so th Company may give consideration to increasing the maximum amount specified.

## 9. EXPENSES

Company shall not be liable for travel and living expenses incurred by personnel of Consultant in connection w services provided under Company's Task Order(s), unless Company has given its express prior writt agreement to reimburse Consultant for said travel and living expenses. If approved, Company agrees reimburse Consultant for its reasonable expenses in accordance with CIGNA Consultant Travel and Relat

Expenses Policy, dated 1998 (attached hereto as Exhibit "C").

To request travel for consultants traveling on a limited basis, the Project Manager must order a ticket through Rosenbluth Travel under the consultant's own Travel Profile, charging it to their expense center.

## 10.   MAILING ADDRESSES

a.   Notices to the Company
shall be sent to:

Connecticut General Life Insurance Company
Two Liberty Place, TLP29A
1601 Chestnut Street
Philadelphia, PA 19192-2296

b.   Invoices will be sent to respective Project Manager as outlined in the Task Order(s).

c.   Payments and notices
to the Consultant shall
be sent to:

EDP/Temps and Contract Services
433 South Main Street
West Hartford, CT 06110

## 11.   AFFILIATED COMPANIES

Affiliated Companies shall mean, as used herein, CIGNA Corporation and any company owned or controlled directly or indirectly by CIGNA Corporation. Any affiliated company and Consultant may execute a Task Order, incorporate this Agreement by reference, and become bound by its terms and conditions as to that Task Order. All Task Orders, whether by Company or Affiliated Companies, incorporated by reference shall count toward the Cumulative Total Dollar Amount of Task Orders issued under Paragraph 2.

## 12.   PERFORMANCE OF SERVICES:

a.   Consultant agrees to perform the Services hereunder (the "Services") in a good, professional, and workmanlike manner. If so requested by Company, Consultant shall replace or withdraw any employee or agent performing the Services, if in the opinion of Company the performance of such employee or agent is unsatisfactory, or if the employee or agent is unacceptable to Company for any reason whatsoever. Consultant shall not employ, contract with, or use the service of any other consultant, special contractor, or other third party in connection with the performance of the Services, without the prior written consent of the Company.

b.   Consultant represents and warrants:

(1)   that the employees and agents of Consultant performing the Services are fully qualified and skilled to perform the Services and shall exercise their best professional skill and judgment in the rendering of those services;

(2)   that the Services furnished by Consultant hereunder shall meet the requirements set forth in the Company's Task Order(s) and shall conform to any other applicable specifications furnished by Company during the term of said Task Order(s);

(3)   that all programmed documentation and other information (regardless of format) specified to be provided by Consultant under this Agreement shall be in accordance with the highest professional

3

standards, shall be free from errors and omissions, and shall be complete in every respect. The Consultant shall be fully responsible for the cost of changes resulting from errors, omissions, ambiguities, coordination problems, and other defects in the documentation; and

(4)    that the project as designed by Consultant be workable and fit for its intended use, and that it will comply with all applicable governmental regulations.

(5)    That Consultant's equipment, systems and software necessary to provide the services are Year 2000 Ready. "Year 2000 Ready" means that equipment, systems and software:

    (a) execute correctly with run dates prior to, during and after the year 2000

    (b) produce accurate results from calculations and comparisons using dates prior to, during and after the year 2000

    (c) maintain date data in a format that is accurately and consistently portrayed

    (d) produce output in which dates are represented in a format acceptable to all users

    (e) recognize the year 2000 as a leap year.

## 13.  CONFLICT-OF-INTEREST:

a.    Consultant represents and warrants that no prior or present Services provided by Consultant to third parties conflict with the interests of Company or Affiliated Companies in respect to the Services being provided hereunder, except as disclosed by Consultant to Company in a writing and the original or copy thereof is appended to this Agreement. Consultant agrees that during the term of this Agreement it shall not provide services or contract to provide services to any third party which may conflict with the interests of Company or Affiliated Companies, except with the prior written consent of Company.

b.    Consultant represents, warrants, and agrees that no employee, agent, or representative of Company or Affiliated Companies, or other consultant advising the Company or Affiliated Companies, shall be offered or receive from the Consultant, directly or indirectly, any benefit, fee, commission, dividend, or consideration of any kind in connection with the Services of the Consultant, except as expressly authorized in writing by the Company. Without limiting the foregoing, Consultant specifically represents, warrants, and agrees that no employee of Company or Affiliated Companies is a partner, partial owner, shareholder, or holder of any beneficial interest in Consultant, except as expressly authorized by Company or Affiliated Companies, in writing, and the original or copy of such writing is appended hereto at the time of execution of this Agreement. IN THE EVENT THE REPRESENTATIONS, WARRANTIES, AND AGREEMENTS IN THIS PARAGRAPH ARE UNTRUE OR ARE BREACHED, CONSULTANT AGREES TO DISGORGE TO COMPANY ANY PAYMENTS MADE BY COMPANY TO CONSULTANT HEREUNDER.

c.    Consultant represents and warrants that in the provision of the Services hereunder and any recommendation made by Consultant to Company in connection with the Services, neither the Consultant nor its employees and servants will benefit indirectly or directly from the reliance by Company upon such Services or recommendations, except as specifically disclosed in writing by Consultant to Company in this Agreement or by document appended hereto at the time of execution of this Agreement.

## 14.  CONSULTANT'S LIABILITY

In addition to any liability or obligation of the Consultant to Company that may exist under any other provision of this Agreement or by statute or otherwise, Consultant shall be liable to and will hold harmless, indemnify, and defend Company and Affiliated Companies from and against any damages, costs, claims or liabilities which Company or Affiliated Companies may sustain, as a result of:

a.    any infringement or misappropriation of any claimed copyright, patent, trade secret, or other proprietary right of or in programs, software, algorithms, designs, plans, drawings, or specifications resulting from the

4

use or adoption of any designs, plans, drawings or specifications, or services furnished by the Consultant hereunder; or

b. any non-authorized or wrongful disclosure by Consultant or its employees or agents of confidential and proprietary information as set forth in Paragraph 15 below;

c. any negligent or wrongful act of the Consultant, its agents, servants, employees, officers, or sub-contractors; and

d. any claim in connection with bodily injury or death to employees of Consultant.

## 15. CONFIDENTIAL AND PROPRIETARY INFORMATION

In the course of performing its Services, or in connection with such Services, Consultant will receive from Company and Affiliated Companies, data, information, documents, and other material belonging to, prepared by or for, or concerning Company, Affiliated Companies, and their customers, employees, insureds, patients, and software and trade secret licensors. For purposes of this Agreement all such data, information, documents, and other material, including all summaries, extracts, copies, compilations, analyses, interpretations, presentations, and other materials derived therefrom, shall be called the "Information." Consultant agrees that until such time as any such Information becomes a part of the public domain without breach of this Agreement by the Consultant or any agent or employee of Consultant, and in any event for at least five (5) years after termination of this Agreement, Consultant shall:

a. treat, and obligate Consultant's employees, if any, to treat as secret and confidential, all such Information whether or not it be identified by Company as confidential;

b. not disclose any such Information or make available any reports, recommendations and/or conclusions which Consultant may make for Company to any person, firm, or corporation or use it in any manner whatsoever without first obtaining Company's written approval;

c. not disclose to Company any proprietary information obtained by Consultant on a confidential basis from any third party unless (1) Consultant shall have first received written permission from such third party to disclose such information or; (2) such information is in the public domain at the time of disclosure;

d. to reveal the Information only to such of Consultant's employees who require access to such Information in order to perform the Services hereunder; and

e. not to employ the Information to Consultant's advantage, other than as herein provided. Consultant acknowledges that Company and Affiliated Companies are licensees under license agreements with software licensors, which agreements obligate Company and Affiliated Companies to maintain the confidentiality of trade secrets and to not infringe the copyrights of such licensors, and Consultant agrees with respect to any such third party software or trade secrets made available by Company or Affiliated Companies to comply with the obligations in any such agreements and to maintain the strictest confidentiality with respect to such third party software and trade secrets. Consultant acknowledges that the Information constitutes a "Trade Secret", that it is being disclosed to Consultant on the basis of a confidential relationship established under this Agreement, that the Information is to be used only as expressly permitted hereunder, and that the restrictions of this paragraph are necessary to protect the secrecy of such Information and to protect against the occurrence of injury or harm to Company and Affiliated Companies.

Neither party shall attempt to access information not necessary for its performance hereunder

**16.**    OWNERSHIP OF DOCUMENTS, COPYRIGHTS, PATENTS, AND OTHER MATERIALS

All originals and negatives of all analyses, plans, drawings, reports, photographs, charts, programs, software, algorithms, models, specimens, specifications, and other documents or materials required to be created by Consultant hereunder, including drafts and reproduction copies thereof (the "Proprietary Materials"), shall be and remain the exclusive property of Company and Company shall have the right to publish, transfer, sell, license, use and modify all or any part of such Proprietary Materials without payment of any additional royalty, charge or other compensation to Consultant. Consultant acknowledges that any copyrightable or patentable materials or inventions developed by Consultant hereunder shall be deemed to have been developed by Consultant as an employee or "for hire" as defined by U.S. Patent or Copyright Law, so that all copyright or patent rights in said Proprietary Materials and associated materials belong exclusively to Company.  To the extent that any such Proprietary Materials or parts thereof may not be deemed "works for hire" or, employee work product by operation of law, then Consultant hereby conveys and assigns all rights, title, and interest in the ownership of any copyright or patent in said Proprietary Materials to Company, and said copyright or patent shall vest in Company immediately upon creation.  Company shall have the right to obtain and hold in its own name copyrights and patent registrations and similar protection which may be available in any such Proprietary Materials.  Consultant agrees to give Company, or its designees, all assistance reasonably required to perfect such rights including but not limited to, the identification of any such materials and the execution of any instruments required to register copyrights or patents. At the request of Company, Consultant will deliver to Company all Proprietary Materials, including copies, in its possession, except that Consultant, with Company's written consent, may retain copies of such reports and other documents for general reference use.

b.    Any other materials owned or to be procured by Consultant to be delivered or furnished by Consultant to Company hereunder, which are not created specifically by Consultant for Company, will be licensed or otherwise conveyed to Company to the extent necessary to fulfill the requirements of the specifications set forth in the Task Orders attached to and made a part of this Agreement.

c.    Consultant waives, to the extent permitted by law, all rights of attribution and integrity in any visual art (as defined in the Copyright Act of 1988 as amended) created pursuant to a Task Order hereunder.

**17.**    PROJECT MANAGER

The Project Manager shall be the individual designated as such by Company's Task Order(s).  In lieu of such designation, such other individual as designated by the person signing this Agreement on behalf of Company. Such individual shall be Company's representative in regard to said Task Order(s).  Whenever action is to be taken, or approval or acceptance or information given or taken, to or by Company hereunder, such action shall be deemed to have been taken or given only if so taken or given by the Project Manager or by the individual signing the Agreement on behalf of Company.

**18.**    INDEPENDENT CONTRACTOR AND COMPLIANCE WITH LAWS AND REGULATIONS:

a.    Consultant's status shall be that of an independent contractor and not that of a servant, agent, or employee of Company.  Consultant shall not hold itself out as, nor claim to be acting as, an employee, agent, or servant of Company or Affiliated Companies.  Consultant is not authorized to, and shall not make any agreements or representations on behalf of Company or Affiliated Companies.

b.    Consultant agrees that Consultant and Consultant's personnel are not entitled to any CIGNA employee benefits and that they are not eligible to participate in CIGNA employee benefit programs.

c.    Consultant shall cause its employees and agents to observe the working hours, working rules, security regulations, and holiday schedules of Company while working on Company premises and to perform their respective duties in a manner which does not unreasonably interfere with Company's or Affiliated Companies' business and operations.

d.   Consultant shall secure any licenses and/or permits required for the proper performance of the Services, paying the fees therefor, and shall take all necessary precautions to assure the safety of its employees who are engaged in the performance of the Services and of all equipment and supplies used in connection therewith.

e.   Consultant represents and warrants to Company that all personnel providing services pursuant to this Agreement or any Service Order issued hereunder are employees of Consultant and not Company and that Consultant shall at its own expense comply with all applicable worker's compensation, unemployment insurance, employer's liability, minimum wage, and other federal, state, and local laws, ordinances, rules, regulations, and orders.   Consultant hereby indemnifies and agrees to defend and hold harmless Company from and against all claims that Consultant's personnel are employees of Company for any purpose whatsoever, including, without limitation, the withholding or payment of any federal, state, or local income or employment taxes.

f.   Consultant will comply with Company's Consultant Project Security Policy and cause all personnel with access to Company networks to execute and comply with the Consultant Project Security Policy attached hereto as Exhibit "D".

## 19.   PAYMENT

Invoices for payment shall be submitted by Consultant to the address set forth in this Agreement.  Each invoice submitted by Consultant shall note the Company Agreement Number so set forth on the face of this Agreement. Reasonable documentation will be provided by Consultant in connection with each such invoice.  Company may require additional supporting information, if it so requests.  Payment shall be made within thirty (30) days after receipt of an invoice and all necessary supporting information.

## 20.   RIGHT TO AUDIT

Consultant will keep and make available for the inspection, examination, and audit of Company, its authorized employees, agents or representatives and auditors at all reasonable times, all data relating to the furnishing of services hereunder including but not limited to the records of all receipts, costs and disbursements made by Consultant as hereinabove provided; all books, accounts, memoranda, and all or any other documents substantiating the cost of any and all expenditures and receipts.  Consultant will maintain and provide upon request by Company reasonably complete records to substantiate any variable charges as well as evidence satisfactory independent assessment of its audit control systems (including SAS 70 letters).

## 21.   REPORTS

A Monthly Activity Report detailing all activity provided to Company by Consultant, in the form attached hereto Exhibit "B", shall be forwarded by the fifteenth day of the following month to Ted Kenny.

## 22.   INSURANCE

Consultant will carry and maintain at its own cost with such companies as are acceptable to Company necessary insurance (which shall include as a minimum the requirements set forth below) during the Term of this Agreement, for damages caused or contributed to by Consultant, and insuring Company against claims which may arise out of or result from Consultant's performance or failure to perform hereunder;

A.   Worker's Compensation and Employer's Liability insurance to the full extent as required by applicable laws.

B.   Comprehensive General Liability coverage, including contractual liability and public liability coverage not less than the following amounts:

Bodily Injury, including death, $500,000 each person and $1,000,000 aggregate.

Property Damage of $5,000,000

Errors and Omissions insurance of $5,000,000

C.    Fidelity Performance Bond of $5,000,000.  ~~Consultant, at Consultant's expense, shall forthwith procure and~~ thereafter keep in full force and effect a performance bond reasonably satisfactory in form to Company, payable to Company, and issued by a bonding, insurance, or casualty company satisfactory to the Company, pursuant to which the Licensee will be held harmless by the surety in an amount of at least Five Million Dollars ($5,000,000) from any costs, losses or expenses to Company which result from ~~Consultant's failure to perform the Services as specified hereunder.~~

Consultant's certificate of insurance shall contain a provision that the coverage afforded under the policy(s) will not be canceled without thirty (30) days prior written notice (hand delivered or certified mail, return receipt requested) to Company.

## 23.    USE OF COMPANY NAME

Consultant shall not in the course of performance of this Agreement or thereafter use or permit the use o Company's or Affiliated Companies' name(s) in any advertising or promotional materials prepared by or on behal of Consultant without the prior written consent of Company.

## 24.    AFFIRMATIVE ACTION

Consultant shall comply with the requirements set forth in U.S. Department of Labor regulations dealing with: (a equal employment opportunity obligations of government contractors and subcontractors; (b) employment b government contractors and subcontractors of Vietnam-era and disabled veterans; and (c) employment of th physically handicapped by government contractors and subcontractors. All of the above referenced regulation are hereby incorporated herein and expressly made a part hereof. Inclusion in this Agreement of this Paragrap 24 does not, and shall not be deemed to constitute an acknowledgment or admission by Company that it is government contractor or first-tier subcontractor or that it is obligated to abide by the aforementioned regulation for the purposes contemplated thereby.

## 25.    NOTICES

a.    All notices, demands, and other communications hereunder shall be in writing and shall be deemed have been duly given if personally delivered or mailed first class, postage prepaid as provided elsewhe in this Agreement.

b.    Either party may change the addresses set forth for it herein upon written notice thereof to the other.

## 26.    ASSIGNMENT

Consultant shall not assign or subcontract all or any part of its rights or obligations hereunder, without the wri consent of Company. Any attempt to assign or subcontract this Agreement by Consultant shall be null and v and of no force or effect.

## 27.    BINDING EFFECT

This Agreement shall inure to the benefit of and bind the respective successors and assigns of the parties here

**28. WAIVER**

No delay or omission on the part of any party hereto in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement.

**29. PARAGRAPH HEADINGS**

The paragraph headings used herein are for reference only and shall not limit or control any term or provision of this Agreement or the interpretation or construction thereof.

**30. APPLICABLE LAWS**

This Agreement shall be deemed to be entered into and shall be interpreted and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**31. EXHIBITS**

All exhibits referred to, in, or attached to this Agreement are integral parts of this Agreement as if fully set forth herein.

**32. ENTIRE AGREEMENT**

This Agreement constitutes the entire contract between the parties hereto pertaining to the subject matter hereof and supersedes all prior proposals, agreements, understandings, negotiations, and discussions, whether written or oral, of the parties in connection with the subject matter hereof. No change, amendment, or modification of this Agreement shall be binding unless in writing and executed by the party to be bound thereby.

**33. RELEASE AND DISCHARGE**

Upon receipt of final payment hereunder, if so requested by Company, Consultant shall execute and deliver to Company an instrument releasing Company of and from any and all claims, demands, and liabilities arising from, growing out of, or in any way connected with this Agreement.

**34. DISPUTE RESOLUTION**

a. Negotiation. The parties will attempt in good faith to resolve any controversy, dispute, claim or question arising out of or in relation to this agreement, including without limitation its interpretation, performance or non-performance by either party, termination, or any breach thereof (hereinafter, collectively "Controversy") promptly by negotiation between designated representatives of the parties who have authority to settle the Controversy and do not have direct responsibility for administration of this agreement.

The disputing party shall give the other party written notice of the Controversy. Within twenty (20) days after receipt of the above notice, the receiving party shall submit to the other a written response. The notice and response shall include (a) a statement of each party's position and a summary of the evidence and arguments supporting its position, and (b) the name and title of each party's designated representative. The designated representatives will meet at a mutually acceptable time and place within thirty (30) days of the date of the disputing party's notice and thereafter as often as they reasonably deem necessary to exchange relevant information and to attempt to resolve the Controversy.

b:   Mediation.  If the Controversy has not been resolved by negotiation within forty-five (45) days of the disputing party's notice, or the party receiving the notice will not meet within thirty (30) days, either party may, upon written notice by one party to the other, initiate mediation of the Controversy in accordance with the Commercial Mediation Rules of the American Arbitration Association, to the extent that such provisions are not inconsistent with the provisions of this section. The parties will jointly appoint a mutually acceptable mediator, seeking assistance in this regard from the American Arbitration Association if they are unable to agree upon such appointment within twenty (20) days of the notice of mediation. The parties agree to participate in good faith in the mediation and negotiations thereto for a period of thirty (30) days after the appointment of the mediator. The parties shall share equally the cost of the mediation.

c.   Binding Arbitration.  If the Controversy has not been resolved by mediation within thirty (30) days of the appointment of the mediator, or if a mediator is not appointed within thirty (30) days of the notice of mediation, upon written notice, either party may elect to submit the Controversy to binding arbitration conducted in Philadelphia, PA or Hartford, CT. The parties to this agreement, by entering into it, are expressly waiving their rights to have any Controversy decided in a court of law and/or equity before a judge or jury, and instead are accepting the use of binding arbitration. Such arbitration shall be governed by the provisions of the Commercial Arbitration Rules of the American Arbitration Association, to the extent that such provisions are not inconsistent with the provisions of this section.

In the event the parties cannot agree upon a single arbitrator within thirty (30) days of the written notice of arbitration above, each party shall choose one (1) arbitrator within fifteen (15) working days after the expiration of such thirty (30) day period and the two (2) arbitrators so chosen shall choose a third arbitrator. If either party refuses or otherwise fails to choose an arbitrator within such fifteen (15) working day period, the requesting party may choose a total of two (2) arbitrators who shall choose the third. If the two (2) arbitrators chosen fail to select the third arbitrator within ten (10) working days after both have been named, each arbitrator shall name three (3) candidates, of whom the other shall decline two (2), and the decision shall be made by drawing lots. The arbitrator(s) chosen shall act as neutral arbitrator(s). In the event of the death, disability or incapacity of any arbitrator, a replacement shall be named pursuant to the process which resulted in the selection of the arbitrator to be replaced.

If the arbitrator(s) or the parties determine, at any stage of the proceedings, that specialized expertise is necessary to fully evaluate and decide the Controversy, a neutral advisor with the experience and qualifications necessary to assist the arbitrator(s) to decide the Controversy may be selected provided that the use of an expert neutral advisor is approved by all parties. Once the determination to utilize an expert neutral advisor is made, the arbitrator(s) shall propose such a neutral advisor. Either party may veto the neutral advisor proposed by the arbitrator(s) within five (5) working days of receiving notice of the proposal. Absent such a veto, the neutral advisor proposed by the arbitrator(s) shall be retained. If the neutral advisor proposed by the arbitrator(s) is vetoed by one or both of the parties, the arbitrator(s) shall continue to propose neutral advisors until one is accepted.

The arbitration hearing shall be held within thirty (30) days following appointment of the final arbitrator, unless otherwise agreed to by the parties. If either party refuses or otherwise fails to participate in such an arbitration hearing, such hearing shall proceed and shall be fully effective in accordance with this section, notwithstanding the absence of such party. The arbitrator(s) shall determine the Controversy in accordance with the substantive law of the State of Connecticut, excluding the conflicts provisions of such law. The arbitrator(s) may abstain from following the strict rules of evidence. The arbitrator(s) shall render their decision within thirty (30) days after the termination of the arbitration hearing. The arbitrator(s) may grant any remedy or relief deemed just and equitable with the exception of punitive or exemplary damages. The decision of the arbitrator, or a majority of the arbitral panel, shall be final and binding upon the parties with no right to appeal. Judgment may be entered upon the award of the arbitrator(s) in any court of competent jurisdiction. Each party shall assume its own costs, but the compensation and expenses of the arbitrator(s) and any administrative fees or costs associated with the arbitration proceeding shall be borne equally by each party.

This Dispute Resolution process shall be the sole and exclusive means for resolving any Controversy provid

however, that either party may seek a preliminary injunction, attachments or other provisional judicial relief if such action is necessary to avoid irreparable damage or to preserve the status quo. Despite such action the parties will continue to participate in good faith in this Dispute Resolution process. The initiation of this Dispute Resolution process shall toll the running of the statute of limitations for any cause of action arising from the Controversy. All time limitations contained in the Dispute Resolution sections above, may be altered by mutual agreement of the parties.

## 35. TAXES:

Company will be responsible for any applicable sales, use, real or personal property, franchise or or other, like taxes attributable to periods on or after the agreement date based upon or measured by Consultant's fees for providing the materials, supplies, or services furnished by Consultant in performing or furnishing the services.

Company and Consultant will cooperate to segregate the Fees payable under this Agreement into the following separate payment streams: (1) those for taxable services, (2) those for nontaxable services, (3) those for which a sales, use or similar tax has already been paid, and (4) those for which Consultant functions merely as a paying agent for Company in receiving goods, supplies or services (including leasing and licensing arrangements) that otherwise are nontaxable or have previously been subject to tax. In addition, Company and Consultant will cooperate with each other to accurately determine each party's tax liability and to minimize such liability to the extent legally permissible. Company and Consultant will provide and make available to the other and resale certificates, information regarding out-of-state sales or use of equipment, materials or services, and any other exemption certificates or information reasonably requested by the other party. Consultant will not pay any taxes based on the Services which Company and Consultant disagree on as to whether a tax is due without affording Company a reasonable amount of time after being called upon by the taxing authority to pay such tax to dispute the payment of such tax, at Company's expense, in the appropriate legal forum.

## 36. PRE-PLACEMENT CHECKS

In recognition of Company's desire to maintain a safe and secure working environment for Company employees Vendor agrees that to the extent permitted by law:

1. any Vendor employees, agents or subcontractors who will be working on Company premises for four consecutive weeks or more(for the rest of this section, "Vendor-related Individuals") will a.) pass a criminal background check  and b.) pass a drug test that is comparable to Company's pre-employment drug test for Company employees, and

2. said Vendor-related Individuals will pass such tests/checks within six months prior to commencing work on Company premises or within one week after commencing work on Company premises, and

3. Vendor will provide, at Company's request, timely written certification that Company-specified Vendor-related Individuals meet the requirements of subparagraphs 1 and 2 above; and

4. there will be no additional charge to company for either the direct or indirect costs of said tests/checks including the time spent by Vendor-related individuals related to such tests/checks.

## 37. NON-SOLICITATION

Because of the negative impact on Company's work when a vendor's worker is hired away from a Compan project by another vendor, Consultant agrees  that it will not employ, solicit the employment of or aid any oth party to solicit or encourage the employment of any other party's employee, subcontractor or agent while th person is working on a Company project. For purposes of this paragraph, "employ" means employment eith

directly or indirectly (such as, but not limited to, employment as an independent contractor, employment as either an employee or subcontractor of an affiliate). If Consultant breaches this provision, Consultant agrees to pay Company an amount calculated by Company as the loss to Company resulting from the removal of the other party's former worker from the applicable Company project. Any amount owed to Company by Consultant under this provision may be offset by Company from amounts owed by Company to Consultant.

38.  SURVIVAL

Upon termination of this Agreement the obligations set forth in Paragraphs 12, 13, 14, 15, 16, 23, 24, 29, 30, 34, 35, 36 and 37 shall survive.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the year and date first written above.

EDP/Temps and Contract Services

By: _____

Title:  Director of Contracts

Connecticut General Life Insurance Company

By: _____
      Vincent J. Witkowski, Jr.

Title:    Assistant Vice President

NOTE:  EXHIBITS ARE TO BE ATTACHED TO ALL COPIES OF THIS AGREEMENT AT THE TIME OF EXECUTION.

EXHIBIT "A"

**Company Task Order No.:** _____
**Company Master Agreement No.:99-XXX-XXX**

Date:

# TASK ORDER
# FOR
# CONSULTING SERVICES

**Consultant:**

_____

_____

**Company:**
Connecticut General Life Insurance Company
900 Cottage Grove Road
Bloomfield, Connecticut 06152

WHEREAS, it is desired that Consultant provide services at the general direction of the above mentioned Company in connection with the furnishing of consulting or electronic data processing related services programming, programming analysis, systems analysis, software development, enhancements, technical writing (specifications, user guides), and such other documentation and services as requested by Company and further described herein.

NOW, THEREFORE, in connection with the terms and conditions contained in the Master Agreement No. dated , (the "Master Agreement") and intending to be legally bound, Company and Consultant do hereby agree as follows:

## STATEMENT OF WORK

1. **Scope**

    Consultant shall perform the following Services for Company in connection with:

    **a.** _____

2. **Compensation**

    Company will pay Consultant for the performance of the Services as described herein as follows:

    **a.** Net amount of Consultant's properly documented invoice for payment within thirty (30) days of Company's receipt and Company's Project Manager's approval.

    **b.** Services shall be billed at an hourly rate of_____ Dollars ($_____), less the appropriate discount from the Master Agreement.

    **c.** Company will reimburse Consultant for its reasonable expenses in accordance with CIG Consultant Travel and Related Expenses Policy, dated 1998 (attached to Master Consultant

EXHIBIT "A"

Agreement No. 98–100 as Exhibit "C"), but reimbursement for expenses shall not exceed _____ Dollars ($_____), without a written amendment to this Task Order.

d.   The maximum amount to be paid hereunder, without a written amendment to this Task Order is _____ Dollars ($_____).

3.   <u>Invoicing for Payment</u>

In accordance with the terms and conditions of the Master Agreement, Consultant shall send invoices to:

_____

_____

_____

Attention: _____

4.   <u>Period of Performance</u>:

a.   Commencement Date:   _____

b.   Completion Date:   _____

TIME BEING OF THE ESSENCE.

5.   <u>Place of Work</u>:   _____

6.   <u>Consultant's Personnel</u>:   _____

7.   <u>Company's Project Manager</u>:

All work shall be coordinated with and performed to the complete satisfaction of Company's Project Manager, _____

Upon full execution of this Task Order for Services, Company and Consultant agree that all of the terms and conditions of the Master Agreement are hereby incorporated by reference and affirmed by parties and that the Master Agreement and this Task Order represent the entire Agreement between Company and Consultant with respect to the Services described herein, and it shall not be modified superseded except through a writing signed by both Company and Consultant.

IN WITNESS WHEREOF, the parties hereto execute this authorization for consulting services on the date set forth below.

Consultant:                                    Company:

By: _____          By: _____

Title: _____       Title: _____

14.

**Monthly Report For** _____

| Consultant(s) At Clgna Last Name, First Name | Project Manager | Task Order Number | Start Date | Anticipated End Date | Fixed Price or T&M | Hourly Amt. or Project Amt | Total Amt of Task Order | Total Amt Invoiced |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | $ |
| | | | | | | | | $ |
| | | | | | | | | $ |
| | | | | | | | $ | $ |

exhibit "g"

## EXHIBIT C

## CIGNA CONSULTANT
## TRAVEL
## AND
## RELATED EXPENSES POLICY

### INTRODUCTION

CIGNA's Systems Chief Contracts Officer establishes expense policy and administrative procedures for CIGNA to ensure that all consultants are guided by a common set of expense guidelines.

This booklet defines the Company's policy and procedures pertaining to individual business travel and entertainment expenses and sets forth a general framework for CIGNA's Consultants to follow.

The guidelines contained in the policy statement are the minimum acceptable standards to be used by CIGNA Consultants.

Each Business Division may implement a more restrictive policy if deemed appropriate.

### GENERAL POLICY STATEMENT

Consultants will be reimbursed in accordance with CIGNA 's Consultant Travel and Related Expenses Policy for all necessary and reasonable expenses incurred in the conduct of CIGNA business.

Consultants must account for all travel advances and expenses by submitting a complete and accurate expense report on a monthly basis to their respective employer. Less frequent travelers should submit their complete travel expense report upon completion of each trip.

*Consultants need to adhere to the following guidelines:*

- *They may not arrange to have charges on their behalf direct billed to CIGNA.*

- *They are required to provide detailed information regarding their expenses to their employer.*

### APPROVAL RESPONSIBILITIES

Travel expenses submitted for reimbursement *must have the original signature of* the employee's manager or designated employee with appropriate approval authority. The approving manager is responsible for assuring that the expenses are legitimate, reasonable, properly documented and in conformance with CIGNA's policy.

Exceptions to the stated policies must be specifically approved on an individual basis by the responsible Project Manger or his/her designee.

### RECEIPT AND DOCUMENTATION REQUIREMENTS

*Adherence to these guidelines regarding receipts, documentation, and explanation is essential.* Original receipts must obtained and submitted with the employee's travel expense report for all expenditures of $25 or more.

The following expenses require receipts regardless of amount or method of payment: hotel,

# EXHIBIT C

automobile rental, company paid transportation, airline passenger coupon, and rail tickets.

The traveler should request a receipt when it is not routinely provided in the due course of business.

Original credit card receipts or itemized register receipts are acceptable forms of documentation.

When no receipt is available or the receipt has been lost, a written explanation should be given on the expense report.

## CIGNA CORPORATE TRAVEL SERVICES

Travel costs represent one of CIGNA's largest expenses; therefore, it is important to make every effort to ensure that all trips are necessary and that lowest reasonable rates/fares are obtained. CIGNA Corporate Travel Services supports these policies by ensuring that travel services personnel and designated vendors conform to them.

CIGNA Corporate Travel Services has negotiated discounted CIGNA rates with designated vendors on rental cars, hotels and discounted airfare between certain heavily traveled destinations.  Travelers are required to use these preferred vendors unless business requirements dictate otherwise.  Specific travel related questions and/or concerns should be referred to CIGNA Corporate Travel Services.

All CIGNA consultants who plan to travel on CIGNA business should adhere to the following procedures:

Utilize the designated Corporate travel agency to make air, rail, hotel, and car rental reservations.

## DESIGNATED TRAVEL AGENCIES

All consultants must make air and rail tickets, hotel and rental car reservations through the CIGNA Corporate travel agency where available.

Travelers are required to submit travel itineraries (provided by the CIGNA Corporate Travel Agency) with each expense report to document that arrangements have been made through the Corporate travel agency. The current CIGNA Corporate Travel Agency is Rosenbluth (1-800-338-6450)

Where the Corporate travel agency is not available, individuals should purchase tickets using the individual Personal Credit card.

Any airline tickets charged to personal/affinity credit cards will require CIGNA's exception approval for reimbursement.

## AIR TRAVEL

Coach is the approved class of travel for all consultants on domestic and international flights. Business class is optional for international flights greater than eight hours flying time with approval of the CIGNA Project Manger or his/her CK designee.

Every effort should be made to qualify for the lowest logical airfares by planning trips and ordering tickets in advance

## EXHIBIT C

by allowing flexibility in arrival and departure times. The Corporate travel agent will book non-refundable tickets whenever substantial savings are available, unless unrestricted refundable tickets are specifically requested. *Any unused tickets must be returned to the Corporate travel agency and may be used for future travel subject to the same restrictions as the original ticket with a minimal penalty.* The penalty fee is a company expense.

## USE OF PRIVATE AIR/WATER CRAFT

Use of private/personal air/ water craft is not approved. *No payment or reimbursement* will be made for the use of personal air/water craft.

The use of commercial charters is permitted, *only with the pre-approval of* Executive Travel Services. The chartering company must be one of CIGNA approved Charter Companies.

## RAIL TRAVEL

Consultants should use coach class when traveling by rail. When an overnight stay is required on board a train, a roomette or duplex accommodation is permitted.

## GROUND TRANSPORTATION

Consultants should use the most economical and reasonable means of ground transportation that satisfies the traveler's business purpose and requirements. These include and are limited to taxis, airport/hotel shuttle vans, rental car, personal car and public transportation.

*Use private services only when valid business reasons preclude the use of more economical modes of transportation.*

## RENTAL CARS

Rental cars should be used only when they are clearly the most economical mode of transportation.

When reserving a car through a non-designated CIGNA travel agency, all insurances/ coverages must be maintained.

When reserving a car through a designated travel agency, consultants should:

- Request a compact or intermediate size car through the designated Corporate travel agency to obtain CIGNA contracted rates.

- Refuse Loss/Collision Damage Waiver (LDW), Personal Accident Insurance (PAI), and Personal Property Insurance (PEP) for domestic business travel. CIGNA is self-insured and provides coverage for business rental you will not be reimbursed if you purchase this coverage.

- Purchase available insurance coverage for business rentals outside the continental U.S., the cost of which will reimbursed as a business expense.

- Return the rental car with a full tank of gasoline to avoid a refueling charge by the vendor.

- Consultants should use their corporate charge card to pay for rental cars and be reimbursed through the trav expense report process. (Direct billing of rental car expenses is not authorized.)

- When rental cars are used for combined personal and business travel the employee should consider purchasing Loss/Collision Damage (LDW), Personal Accident Insurance (PAI), and Personal Property Insurance (PEP)

## EXHIBIT C

his/her expense. CIGNA's self insurance will not apply to personal usage, e.g., weekends or extended non business travel.

## PERSONAL CARS

When public transportation is unavailable or impractical, you may use a personal auto for business purposes.

- Reimbursement for miles traveled will be at the maximum rate allowed by the IRS. *The mileage rate established by the IRS covers all gasoline, operating and maintenance costs.*

- Parking charges and tolls will be reimbursed.

- Fines for parking or traffic violations will not be reimbursed under any circumstances.

- When submitting mileage for reimbursement the traveler should show the miles traveled and the rate, as well listing the destinations traveled to on the face of the expense report under purpose of travel. A detail log, mileage and client visits is acceptable documentation.

- Consultants using a personal auto must carry minimum auto liability insurance limits of $100,000 person/$300,000 per accident.

- In case of an accident while engaged in Company business, Company liability insurance will apply above personal insurance. Physical damage coverage by the Company will apply for the least of the actual loss, personal deductible or $1,000 as appropriate.

## LODGING

All lodging reservations must be made through the Corporate travel agency, where available. Preferred hotels should utilized to take advantage of discounted hotel rates. *Risk Management has evaluated these hotels for the safety security of travelers.*

- Lodging bills should be paid by the traveler and included on expense reports with an *original* itemized invo attached. Direct billing of lodging expenses to CIGNA is not authorized

- Room cost, including taxes, should be listed separately from room service meals, parking, phone charges, e the expense report due to different tax law treatments of these expenses.

- A consultant will be reimbursed for one gift, meal or other token of appreciation at a cost not to exceed the r cost of public accommodations for one night when he/she is a guest in a private home of a friend or relative *in of incurring lodging expenses.* A receipt is required for this type of expense regardless of the cost.

## PERSONAL MEALS

The actual cost of meals purchased by an employee while traveling on Company business is generally reimbursable employee leaves after the normal breakfast time or returns before the normal dinner time no expense should be in Maximum expense for personal meals will not be reimbursed over $40.00/day.

# EXHIBIT C

## FOREIGN TRAVEL

Expenses related to normal foreign business travel are reimbursable.

- They must be reported on the travel expense report form in U.S. currency. The exchange rate applicable at the time of the trip (as applied to charges on the employee's AMEX card or as posted in the Wall Street Journal) should be used in converting expenses to U.S. dollars, and noted on the expense report and the accompanying receipts.

- *Rules for foreign travel in excess of seven consecutive days, are more restrictive than rules for domestic travel.*

The employee will not be reimbursed for that portion of foreign travel expenses not allocable to the trade or business activity.

## AIRPHONE USAGE

*Traveler will be reimbursed for using an airphone only if an emergency or critical business issue is involved.*

## OTHER REIMBURSABLE EXPENSES RELATED TO TRAVEL

Specific miscellaneous or other expenses *incurred while traveling* include:

- Dry cleaning/laundry expenses for trips exceeding five working days.

- Business postage, photocopy, miscellaneous supplies or secretarial services required during a trip.

- Traveler's check fees and currency exchange fees, where applicable.

- Personal phone calls home while away on overnight business trips, to the extent that they are of reasonable frequency and duration.

- Fees for dependent care, elder care, pet care, home sitting, etc. when travel is not normally required as part consultant's engagement. This requires written approval of the CIGNA Project Manager prior to starting assignment

- 
- Tips for service where no other expense is incurred, such as baggage handling, are reimbursable and should appear on the expense report in the "other" column with an explanation.

- *Use of hotel safes and airport lockers to safeguard equipment and personal belongings. CIGNA encourages travelers to leave expensive jewelry and personal belongings at home.*

*Reimbursement for the use of exercise facilities and equipment while traveling is at the discretion of each CIGNA Pr Manager. Minimal expenses deemed reasonable and necessary may be allowed. Check with CIGNA's Project Man*

# EXHIBIT C

*prior to incurring the cost.*

## NON-REIMBURSABLE EXPENSES RELATED TO TRAVEL

The following expenses which may be incurred in conjunction with business travel are not reimbursable and should not be included on a travel expense report:

- Fees associated with any personal charge/credit cards, *including all discount programs.*

- Air travel, rental car or other personal trip insurance.

- Charges for a barber, manicurist, beautician, shoeshine, masseur, etc.

- Athletic, social or country club fees for personal activities.

- Cost of newspapers, magazines, toiletries, cigarettes, etc.

- Fees for dependent care, elder care, pet care, home sitting, etc. arising from travel normally required by engagement.

- Medical expenses.

- Personal articles or clothing.

- Personal entertainment, such as in-room movies and mini-bars.

- Luggage/briefcases.

EXHIBIT "D"

## CONSULTANT PROJECT SECURITY POLICY

1. This policy describes the security practices required by Company for all consultants or other third parties which are afforded access to Company's networks.

As a non-employee having access to Company's systems or networks, Company's policy requires that you:

a.   Comply with the CIGNA Data Security Policy. (Copy available upon request) Promptly report all policy violations that you know of or suspect to the Consultant Project Manager.

b.   Violation of the CIGNA Data Security Policy will be met with disciplinary action. Violation could result in the termination of your employment and/or criminal prosecution.

c.   Keep your personal security IDs and passwords confidential. Do not share your IDs, passwords, or random password cards with anyone. Also, do not post or record your IDs and passwords where they can be viewed or accessed by unauthorized persons.

d.   Personally enter your password when you log on. Do not automate this process through your PC or workstation.

e.   Change your passwords periodically, to protect their confidentiality.

f.   Secure any unattended active workstation from unauthorized access and never leave it unprotected.

g.   Use CIGNA computing resources and data only for approved work, and not for personal or unauthorized business.

h.   Follow the access security processes and restrictions established by the data owners and the management responsible for the access security systems.

i.   Not install modems or other dial access devices on your PC or workstation for Internet access, or any other access, without your manager's approval.

j.   Follow the dial access and Internet access security processes and restrictions established by the data owners and the management responsible for the dial access security systems.

k.   Never establish a dial connection to the Internet, or any network connected to the Internet, from a PC or workstation that is connected to the CIGNA network.

l.   Not use the Internet, or any other network, from a CIGNA processing environment for other than business purposes.

m.   Not export or import, via any network, licensed or copyrighted material without the specific authorization of the owner.

EXHIBIT D

n. Maintain a professional demeanor in all communications, especially those on public forums. Any communications involving harassment or obscenities will result in disciplinary action.

o. Not install software on your PC or workstation without your manager's review and approval.

p. Not install illegal copies of licensed software on your PC or workstation. Such action violates federal copyright laws.

q. Periodically run a virus scan on your PC or workstation.

r. Promptly report all virus detections to your manager and systems support area.

2. In addition to the specific requirements listed above, remember that all Company documentation, programs, information and project data is Company proprietary information. Professional ethics and your contract require you protect this information from disclosure.

3. Finally, project plans, project status and/or specific problems must not be discussed with anyone, other than members of your Project Team with a need to know or CIGNA employees supporting the Project.

4. If there are questions or suggestions regarding this policy or project security, please discuss them with the Company Project Manager and/or Consultant Project Manager.

5. All members of the Project Team must signify our agreement to be bound by this policy by signing and dating a copy of this Policy. Return one signed copy to the Consultant Project Manager and retain one copy for reference. The Consultant Project Manager is required to provide an original signed policy to Company's Project Manager.

Consultant Company Name: _____

Consultant's Project Team Member _____
(Print Name)

Signature _____

Date _____

16

EXHIBIT "E"

### Skill Sets and Maximum Fees Per Hour

| Position Description | Years Experience | Skills | Hourly |
|---|---|---|---|
| Bus. Analyst | 7-10 | Mainframe | 60 |
| | | Client/Server | 65 |
| | | Emerging Tech | 75 |
| Systems Analyst | 7-10 | Mainframe | 70 |
| | | Client/Server | 80 |
| | | Emerging Tech | 95 |
| Jr Programmer | 3-5 | Mainframe | 50 |
| | | Client/Server | 70 |
| | | Emerging Tech | 85 |
| Sr Programmer | > 6 | Mainframe | 65 |
| | | Client/Server | 80 |
| | | Emerging Tech | 90 |
| Graduate | 0-2 | Mainframe | 40 |
| | | Client/Server | 50 |
| | | Emerging Tech | 55 |
| Team Leader | 7-10 | Mainframe | 70 |
| | | Client/Server | 90 |
| | | Emerging Tech | 105 |
| Project Manager | 8-15 | Mainframe | 80 |
| | | Client/Server | 100 |
| | | Emerging Tech | 125 |

MAINFRAME SYSTEMS DEVELOPMENT
Mainframe environment using "traditional" programming/ analysis languages (e.g.
AS/400, Pascal, Foxpro, FORTRAN, COBAL, CICS, DB2, PL1, Tandem, Focus,
TAL and RPI.                M DBA (Oracle, IMS, IDRS, DB2)

CLIENT/SERVER SYSTEMS DEVELOPMENT
Skill sets include Visual Basic, Powerbuilder, Omnis/7, Galaxy, X-windows, Motif,
Lotus Notes, Excel, and Applix. This should include all client-side programming
languages that are not captured with Emerging Technology Systems Development.

EMERGING TECHNOLOGIES SYSTEMS DEVELOPMENT
"Emerging" technologies include Perl, Cgi-Bin, and Html. In addition to capturing
Internet-related development tools, and Object Oriented Languages (e.g. C++, Smalltalk).
Likewise, middleware technologies (e.g. DCE/Encina, Corba and Tuxedo).
Including Specialists. (Java, Javascript, E-Business, Image, Voice, SAP Peoplesoft, Oracle Financials)